UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **LAFAYETTE ROBERT ROE,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **1:11-cv-0555-JMS-TAB** |
| | ) | |
| **TARGET CORPORATION,** | ) | |
| **Defendant.** | ) | |

<u>ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Lafayette Robert Roe was employed by Defendant Target Corporation for nearly 19 years when he was fired from his job on April 15, 2010.  Target contends that Roe was let go because of his poor performance, while Roe maintains that he was the victim of discrimination, either due to his age, his sex, his race, his national origin or in retaliation for his complaints regarding illegal discrimination and/or his use of leave under the Family and Medical Leave Act ("FMLA").  Roe is a white American born male who was 46 years old at the time of his termination.  Following the filing of his charge of discrimination with the Equal Employment Opportunity Commission in May of 2010, no resolution of his claim was reached and the agency issued him his right to sue letter In January 2011, prompting his filing of this lawsuit.

I.      **Factual Background**

        *Inbound Department*

        Roe worked in the "Inbound" department at Target's regional distribution center located in Indianapolis.  As part of the Inbound crew, Roe worked on the distribution center's receiving dock where semi-trailers containing product for Target stores in the region are backed-up to the warehouse doors for unloading and sorting.  The type of freight the Inbound

1

department receives dictates how the freight is processed. Freight that is referred to as "Flow" is unloaded and sent directly to the "Outbound" department to be immediately shipped to Target stores. Freight that is stored at the warehouse for later distribution to the stores is referred to as "Reserve." Cartons are unloaded from the trailers in various ways, including by hand, by forklift, or by pallet jack. Generally, on any given day, there are three main areas where the Inbound employees work: Manual Dock; ART; or, in a specialty function.

Target expects Inbound employees to meet productivity goals it refers to as "common expectations" or "CE." CE is determined by a computer program that analyzes productivity numbers from the top five Target distribution centers in the nation. The CE or expected productivity rate for a given semi-trailer takes into account whether the freight is conveyable, exceedingly large or heavy, flow or reserve, or needs to be broken down into smaller packages for storage or delivery.

*Manual Dock*

In Manual Dock, the semi-trailers typically contain pallets stacked with freight cartons. These palletized loads are, for the most part, unloaded with a forklift. Thus, when Inbound workers are working in Manual Dock they are most often driving a forklift and exerting less physical effort, which makes Manual Dock a more attractive work assignment. Until the introduction of automated technology in 2002, the use of a forklift or hand-truck on Manual Dock was the primary method for unloading freight in Inbound. Because the team concept is not employed in Manual Dock, each worker's productivity, or percentage of CE, while working there is calculated individually.

*ART (Automated Receiving Technology)*

In 2002, a part of the Inbound dock area was dedicated to a new automated process for unloading and sorting freight.  Target calls that area ART, which stands for "Automated Receiving Technology."  Four doors on the receiving dock were fitted with conveyer systems that extend into a dock door and thus, into the semi-trailer.  Rather than using a forklift, in ART workers place most cartons from the semi-trailer onto a conveyor belt where a scanner reads the carton's label and determines whether the carton is Flow or Reserve.  If a carton is Flow, the technology recognizes this and sends the carton up onto the conveyor belt's mezzanine, where it is moved along until it reaches the Outbound department.  If, however, the carton is Reserve, it circles around on a nearby conveyor belt so that it is deposited by the same dock door from which it was unloaded.  Inbound workers then stack these reserve cartons on pallets to be staged for storage.  The scanner technology also allows for real time assessment of productivity by supervisors.

Because of the efficiency it promotes, ART is the company's preferred method of processing freight at the Indianapolis warehouse.  It has been a goal each year that ART has been in place for there to be an increase in the amount of freight processed through that area.  Consequently, as time has progressed, Inbound employees have been spending more and more time unloading in ART.  As of 2010, the goal was to have 70% of freight processed through ART.

Teamwork is critical to maximizing the efficiency and benefits of the ART technology.  The four ART lines are divided up into two sets, each set consisting of two doors/conveyor lines.  Typically, there are six to eight team members working each ART set.  Measurement of productivity is as a team (each individual on a team receives the same productivity

percentage score for the team's day in ART) and the supervisors generally let the workers choose their own teams from those assigned to ART for the day.  For each individual conveyor line, workers on the team have assigned roles:  thrower, processor, or flexor.  A thrower is someone working in the trailer who picks up the cartons and puts them on the conveyor line.  A processor handles the reserve freight, putting those boxes on a pallet so they can be stored as stock in the warehouse.  Finally, a flexor helps out other team members as needed to assure that the conveyer does not get backed up at either end.  For example, if a trailer has a large amount of Flow (i.e. stock taken by conveyor directly to Outbound), there is less need for processors, so the flexor should move into the trailer and help the throwers unload cartons or flex into an adjacent trailer.  It is important for a flexor to recognize when and where to "flex" to ensure that ART's productivity remains high.

*Specialty Functions*

In addition to Manual Dock and ART, Inbound warehouse employees can also be assigned to one of several specialty functions for the department.  These areas require employees who have special training and are not areas that require constant staffing.  For example, Roe was trained for and occasionally worked in "small packages."  Examples of other specialty functions include what is referred to as "re-works" and "sweeps."  Unique to Specialty Functions is the lack of computer generated productivity measurements and goals.

*Inbound Management Hierarchy*

Inbound employees at Target who unload, process and stage the freight are known as team members, ("TM(s)") and on the day shift they constitute an approximate 30 person workforce, which is typically supervised by two group leaders ("GL(s)").  GLs report to the senior group leader ("SGL"), who in turn reports to the general manager ("GM").

4

As part of their supervisory duties, GLs determine the staging of the semi-trailers for unloading by the TMs.  GLs have access to a computer software tool known as a "slotting tool" to schedule the trailers parked at the warehouse for unloading.  The slotting tool takes into account how long the trailer has been sitting unloaded at the warehouse as well as the amount of freight in a given trailer that is Flow, which needs to go directly to Outbound as opposed to storage, and the amount which is conveyable and therefore more appropriate for ART.  Using the slotting tool to create a schedule of trailers to be unloaded that day is one of the first orders of business for dayshift GLs.  That schedule of trailers helps the GLs with their next issue, which is determining how many TMs are needed in each area for the day.  A rotation schedule is kept to help determine which TMs have worked in which areas in the recent past.  If the rotation schedule is effectively used, those TMs who have spent less time in ART that particular week are the first to be assigned to work there that day.  However, employee absences, vacations and the need for trained individuals in specialty areas can cause imbalances during a given week.

On occasion, GLs have been accused by TMs and SGL's of not following the rotation schedule or of "cherry-picking" semi-trailers for TMs they favor, by providing the favored TMs with trailers containing a type of freight for which the CE is easier to achieve.  And, while the rotation list and slotting tools are there for the GLs to use, ultimately the particular work assignment given to a TM for the day and the schedule of trailers to be unloaded are within  the discretion of the GLs.

GLs are also responsible for making entries into the Performance Culture Detail ("PCD") kept for each TM they supervise.  The PCD is a running comment sheet regarding an employee's performance.  Typically, an entry in a PCD might describe a conversation the GL

has with a TM regarding an area he or she might be able to improve in or, less prominently, praise for something well done or extra effort exerted.  GLs also prepare After-The-Fact Productivity Reports ("AFP Reports") which are given to TMs every 13 weeks.  AFP Reports set forth the employee's productivity numbers for the past quarter (13 weeks) and also provide input with respect to that TM's progress in the key areas of "teamwork," "reliability," "safety," "quality" and "job knowledge" – all of which are performance categories covered in an employee's annual review.

At the time Plaintiff was terminated, his GLs were Erik Lopez and Stephanie Eyer; the SGL was Todd Davis; and, the GM was Mike Bogovich.  Lopez replaced Megan Rickert as a GL about six months prior to Plaintiff's termination and Eyer supervised Mr. Roe for ten months or more prior to his departure.  While Lopez trained as a GL, all three would occasionally be working the first shift.

*Roe's Performance Chronology*

Other than some periodic ratings of  "needs improvement" with regard to his attendance, Roe received strong performance reviews from the time he was hired through his 2003 annual review,  garnering ratings of "meets job expectations," "satisfactory +" or "excellent" nearly every year in the rated categories of quality, safety, teamwork , job knowledge and productivity.  Beginning with his annual review in August of 2004, Roe's performance evaluations started to decline.

In 2003, after ART was first introduced to the Indianapolis Warehouse, Roe's reviewing GL, Daryl Cummins, rated him excellent in the category of "teamwork" and "satisfactory +" in all other areas.  In so doing, Cummins stated:

> You have shown that you will work well in the team environment as well as solo.  You are doing a great job with the Import Warehouse project keep up the good work.

Nevertheless, just a year later, Cummins moved to the other end of the ratings spectrum, evaluating Roe as "needs improvement" (the lowest rating on the evaluation form) in the categories of "teamwork," productivity," and "reliability" and setting his overall rating at "needs improvement" as well.  Some of the written comments included in that evaluation reveal that Roe had raised an issue with regard to preferential treatment on the warehouse dock:

> [*Teamwork*] This is an area we have talked about in great length due to past events.  In our environment it is imperative that we are able to have a positive communication with our peers and Group Leaders and strive to be Fast, Fun and Friendly.  You must understand that certain behaviors have an impact on those around you.  We would like to see improvement from you on this section … .

> [*Overall Performance*] As stated earlier, we talked in detail about what I perceive to be possible negative behavior stemming from your concern of preferential treatment to my concern about you disrupting the dock … .[1]

Joshua Cunningham was Roe's reviewing GL for his 2005 annual review.  Cunningham rated Roe's overall performance as needing improvement and specifically found him lacking in the "teamwork" and "reliability" categories.  His written comments reveal a concern that Roe lacked enthusiasm for the company and its programs and that

---

[1] In his brief, Plaintiff contends that his poor review in 2004 coincided with both his reaching forty years of age and his registering complaints that older warehouse workers were being treated less favorably.  However, there is no citation to the record that would support the later assertion and there is nothing the court finds in the record that indicates that the complaints he made in 2004, regarding preferential treatment of others, included any mention of age as a distinguishing factor.  In fact, the court's review of Mr. Roe's deposition and his charge of discrimination suggest that, even giving him all due inferences, the first time he claimed that the preferential treatment received by some employees was age, race or gender based was when he complained to Target in the fall of 2009.

Roe registered his concerns with his peers while everyone was working, instead of bringing those concerns to his supervisors in a respectful manner.

2006 yielded a better overall performance rating of "meets job requirements" for Roe. Nevertheless, he still garnered "needs improvement" ratings in the categories of "teamwork" and "productivity." Roe was evaluated in 2006 by GL Anthony Redmon, who commented under the "teamwork" category:

> You do a great job at teaming with others on the manual dock and in the fast flow area. I would challenge you in this area by building more trust with your team members and your group leaders. You continually question the rotation and other team member's action, as well as the trailers you have to work. Trust that the rotation we have for doors and specialty areas are followed and focus on giving 100% effort every day.

The following year, Roe's overall evaluation returned to "needs improvement," reflecting that same grade in each of the categories of "teamwork," reliability" and "safety." A negative trend in his attendance record in 2007 caused the return of concern over his reliability, but GL Jim Hornek rated Roe's production, when he was working, as "exceeds expectations."

P.J. Vaught was the GL who reviewed Roe's performance for his July 2008 annual review. Again, Roe's overall evaluation was "needs improvement." Vaught found that the quality of Roe's work had experienced a drop-off, which took his rating in that category down to "needs improvement." Roe also continued to receive the "needs improvement" rating in the categories of "teamwork," "reliability" and "productivity." Vaught advised Roe to focus on maintaining a positive attitude and, commenting on his productivity, stated in part:

> Rob, over the last rolling year, your productivity in ART is 85% and 90% on the manual dock, and these numbers have remained remarkably steady since February

2008.  You are 86% in ART and 90% over that time period, so I've really not observed improvement.  This does not meet job requirements.

Roe's PCD for 2009 shows two GL entries in April with regard to discussions regarding "quality" issues.  In response Rob complained to both of his GLs, Erik Lopez and Stephanie Eyer, that he was being singled out and picked on.  On May 6, 2009, the following entry was added to Roe's PCD:

> Rob has a history of inconsistency with quality and production.  Rob's poor attitude also interferes with providing a good working atmosphere.  We will continue to address negative behaviors regarding production and quality with Rob.

Shortly thereafter, Roe applied for and received FMLA leave from May 26, 2009 through July 20, 2009.

Roe contends that he complained of being singled out for criticism and targeted with worse freight than other TMs to nearly every GL who supervised him after he turned 40.  While that may be the case, the record demonstrates that his complaints clearly intensified in 2009, as did the number of negative comments he received from his GLs on his PCD.  In addition to making his complaints known to the GLs who supervised him, including Rickert, Lopez and Eyer, when Roe would see the SGL, Todd Davis, in the area where Roe was working, he would remark to Davis that he was tired of being harassed and discriminated against by the GLs.  Roe also told Davis that the GLs were giving the easier trailer loads to the younger TMs or to "girls or the nonwhite people."

 Seeing no improvement in the way he was being treated and feeling the pressure of the mounting criticism of his work, Roe eventually went to Mike Bogovich, the GM, to complain with regard to the way he was being treated by the GLs .  Roe claims to have started out the conversation with Bogovich by stating that he was he was just trying to

keep his job, but he also states that he went on to convey that he was tired of the harassment and discrimination he was facing from the GLs.  According to Roe, Bogovich told him that it was Roe's own fault and that if all his supervisors had the same negative comments about him, the comments were probably true.

Stephanie Eyer was the GL responsible for Roe's 2009 annual review.  On August 5, 2009, she too evaluated Roe as "needs improvement" in the categories of "reliability," "teamwork," and "quality," and made "needs improvement" his overall rating for the annual review.  Roe's productivity rating was 103.4% overall with ART performance at 88.67% and Manual Dock at 117.71%.  Eyer was critical of Roe's performance in ART, but she assigned him a "meets job requirements" rating in the category of "productivity." Her comments with respect to Roe's overall performance were as follows:

> Rob, your efforts contribute significantly to the DC's success by meeting expectations and managing and working on what needs to be done.  Over the next year, concentrate on your attendance.  Being at work when scheduled and for the entire shift is important to the team.  Going forward, I challenge you to focus on positive communication and teamwork in ART which will help anticipate and remove obstacles resulting in an improved ART performance.  Also, fostering teamwork with all of your peers and supervisors will help make T559 a more Fast, Fun, and Friendly place to work.  Again, if you have any questions, please partner with the right people.  Our goal is to not allow quality issues to travel further down the supply chain and ultimately to the guest.  Lastly, we could use your feedback and opinions on changes to come and how to make Inbound and the building better at meeting our guest's needs.  Please allow us to assist you in becoming successful.

Later, in August 2009, notes were added to Roe's PCD to reflect that a GL saw him leaving ART early (prior to the end of the shift) and when Roe was confronted about his early departure from ART he responded by asking why he was being singled out when others sat near the time clock prior to the shift ending.  The PCD states that Roe was told that everyone was being addressed one on one with regard to this issue, but that

it was his responsibility to work up until five minutes prior to the "bell."  Another August entry in Roe's PCD indicates that in response to Roe's request for an updated attendance report, a GL had a discussion about the 60 hours "out of the building" currently on his record and the significant missed time he had in the first four months of the year, compared to the positive trend being demonstrated since he last missed time on May 6, 2009.  The GL told Roe that if his positive trend continued the running missed hours on his record would go down.  However, two additional comments from GLs in August 2009 were negative with regard to both an ART productivity issue and an ART quality issue.

In late September 2009, Roe took his complaints regarding his supervisors to Jessica Ryan in the Human Resources Department, telling her that he was being discriminated against and harassed by the GLs.  He told her that they were singling him out and watching him "like a hawk," criticizing him at every opportunity.  He complained that they were giving the younger people better freight, allowing those individuals to "make their numbers."   He informed Ryan that his GLs treated people different depending on who they were.  He reported that when he and another TM confronted GL Megan Rickert about her having given TM Suzi Harris an easy load instead of them, Rickert looked at Roe and stated "I don't like you." Roe also reported to Ryan that he was becoming extremely "stressed-out" over the situation and did not know what to do.

The individuals Roe referred to as receiving favorable treatment were Suzi Harris, Dwayne Lang and Jeremy Clark.  Like Roe, all three were Caucasian.  Harris and Lang were over 40 and Lang and Clark were both males.  This, according to Ryan, led her to believe that Roe's use of the words discrimination and harassment was intended in a

broad sense and not in the legal sense.  She claims that Roe's concern seemed to simply be that he, as an individual, was being singled out for criticism and monitoring.  The fact that Roe mentioned that a GL had stated that she did not like him concerned Ryan, so she went to Rickert and talked with her.  Rickert denied telling Roe that she did not like him. In her written summary of Roe's complaint and the follow up conversation she had with Rickert, Ryan also mentions that Rickert told her that Roe had a hard time accepting any type of negative feedback.  Ryan did not follow up with anyone else regarding Roe's complaints to her of harassment and discrimination.

Shortly after Roe went to Ryan, and at a time when Ryan was not in her office, Roe complained to another HR employee, Stacie Warner.  Roe reported to Warner that GL Stephanie Eyer was singling him out for productivity criticism, while other TMs were being allowed to stand around without her criticizing them.  Roe told Warner that GL Megan Rickert stated that she did not like him and that he did not know what list he had been put on, but that it sure seemed to him that every GL he had was putting pressure on him and singling him out for criticism.  Warner reported her contact and conversation with Roe to Ryan.

Roe claims that after he registered his complaint with Human Resources, he began to receive even worse freight assignments.  In addition he received even greater criticism regarding his work habits, including six critical entries in his PCD in the first three weeks of October 2009.  Within a month of his meeting with Ryan, Roe received a written corrective action report for unsatisfactory performance.  At Target, a written corrective action report is deemed either a "counseling" or a "final warning."  Erik Lopez was the GL who initiated this counseling write-up on October 23, 2009, but Jessica Ryan

assisted in preparing the written warning to Roe and she also participated in drafting all of the additional written warnings Roe was to receive.

The October 23, 2009 written counseling detailed 15 different occasions in 2009 when various supervisors spoke to Roe about his work performance not meeting company standards.  Roe was given thirty days in which to improve his performance with the following instructions:

> Address concerns with your Group Leaders in a positive, constructive manner. Follow all instructions from your Group Leader or other Group Leaders and utilize all resources available to address any barriers to your success.  Ensure you are communicating with your fellow team members in a positive manner to meet department expectations.  You must immediately correct your negative trend with productivity, reliability and quality in order to improve your current level of performance throughout the building.
> Suggestions for improvement:
> - Please minimize downtime and remain in your assigned area during working time.
> - Please partner with your GL when you are struggling to meet productivity expectations.
> - Please begin work immediately after start-up, working until break time, and resume working immediately following break.

Roe refused to sign the corrective action form.

On January 1, 2010, Roe received another written counseling, this time for unacceptable conduct.  Stephanie Eyer went over the warning with Roe, which was based on his failure to appropriately report his absence from an overtime shift and not using the proper call-in procedures to indicate his absence within two hours of the scheduled start time.  Roe claims he never signed up for the voluntary overtime shift and he again refused to sign the written counseling form.  The form used by Target for written counseling states that the warning stays in effect for 6 months and that if the employee engages in further conduct which is unacceptable within that time period he is subject to further corrective action, up to and including termination.

The new year brought continued negative entries in Roe's PCD.  The entries documented conversations between GLs and Roe regarding his need to improve performance and attendance.  On January 14, 2010 he was offered a chance to be paired with a trainer in ART, but he declined.  Then, on January 27, 2010, Roe received another written corrective action report.  Though written by Stephanie Eyer, with help from Jessica Ryan, it was Erik Lopez who sat down and went over the document with Roe.  This time the corrective action was for unsatisfactory performance and it was deemed a final warning, with a 12-month effective period.  The description of the basis for the warning and the suggested manner of improvement read as follows:

> Rob, you have been coached on several occasions regarding your quality of work as well as your overall productivity.  On December 1st and December 2nd, 2009 we spoke to you about two separate quality issues and shared with you the impact that quality errors have in the building.  On December 16, January 8th, January 12th, January 14th and January 20th, 2009 [sic] we spoke to you about your productivity.  We reminded you that you needed to utilize your ART training and Flex into the trailer to help throw when there was heavy flow and flex out to the processing line with heavy reserve to keep the ART line moving at all times.
> . . .
> Suggestions for improvement:
> - Utilize your ART training, know and understand your roles and responsibilities when in ART.
> - Please partner with your GL when you are struggling to meet productivity expectations.

Immediately following his receipt of the final warning, Roe requested and received a paid medical leave of absence, which began on January 28, 2010 and, after an extension was approved, concluded on March 14, 2010.  Roe went to the local EEOC office in March 1010, in what he says was an effort to keep his job, but was told that because he had not been fired there was nothing the agency could do at this point and was also told that he should contact an attorney.

Pursuant to the FMLA, Roe's job was protected while he was on leave.  However, when he returned to work, his PCD shows that his GLs spoke with him twice within a few weeks to confront him regarding two absences he had since his return and continued performance issues in ART.   On April 14, 2010, GL Erik Lopez discussed low production figures with Roe, as well as his absences and the fact that he was working under corrective action warnings in both the production and reliability categories.   In response, Roe insisted that he was being picked on.  The following day, 30 days after returning from his FMLA leave, Roe was fired.

Lopez and Eyer were the GLs who recommended Roe's termination.  They claim to have made the recommendation on the basis that he had ongoing issues with "teamwork," "quality," "reliability" and "productivity."  They took Roe's PCD to Jessica Ryan in Human Resources and to the SGL, Todd Davis, and sought and received their support for the decision to terminate his employment.  On April 15, 2010, Roe was brought in to the office from the warehouse floor to meet with Lopez and Jessica Ryan, at which point he was informed that because of his ongoing problem with productivity his employment was being terminated.  Roe provided Lopez with several copies of a hand written letter he had drafted weeks before, in which he informed Target of his intention to pursue "formal charges" against it.  In the letter he claimed Target had discriminated against him on the basis of age, race and sex and that he was the victim of retaliation as well.  After his termination, Roe promptly filed a charge of discrimination against Target with the EEOC, leading to this lawsuit which seeks relief pursuant to the Civil Rights Act of 1866 (42 U.S.C. § 1981), Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§

2000e–2000e–17), the Age Discrimination in Employment Act of 1967 ("ADEA") and the FMLA.

*Plaintiff's Coworkers*

Fellow TMs whom Roe claims received more favorable treatment than he include:[2]

- **Jason Beck** (34-year-old White, American male) Roe alleges that Beck spent more time talking with other TMs, had more downtime, received easier freight, and often received specialty functions assignments. Beck's 2009 annual review stated that Beck was at107% in ART and 133% in Manual Dock, while in 2010 he received an "exceeds job requirements" rating in productivity. Beck's overall rating for both 2009 and 2010 was "exceeds job requirements."

- **Deb Branson** (55-year-old White, American female, used FMLA) Roe claims that Branson had worse productivity than he did because she talked, "wasn't very quick at her job," and "just moved a lot slower." Branson's 2009 review noted that her ART production was 92.77% and Manual Dock 129.51%, while in 2010 her review noted that her ART performance was 95.55% and Manual Dock was 113.6%. She received an overall rating of "meets job requirements" each of those years, but did have a "needs improvement " rating in "reliability" for both 2009 and 2010.

- **Juan Cisneros** (55-year-old Hispanic, Mexican male, used FMLA) Roe believes Cisneros performed below Roe's level of production because he talked a lot with others, ate while he worked on the dock, received easier trailers, and moved slower. In 2009, Cisneros' overall rating was "meets job requirements." His productivity CE was 103.5% , attributable to an ART rating of 92.13% and a Manual Dock rating of 110.99%. In 2010, Cisneros still received an overall rating of "meets job requirements," however his "teamwork" and "productivity" were rated as "needs improvement" and he was the subject of a written corrective action issued by Stephanie  Eyer for unsatisfactory work performance on November 5, 2010. On February 18, 2011, Eyer issued him a final warning with regard to his performance in the categories of "teamwork" and "productivity."

    Cisneros filed a charge of discrimination with the Indiana Civil Rights Commission on February 28, 2011 and a complaint with the Indianapolis/Marion County Office of Equal Opportunity on March 8, 2011. He claimed

---

[2] The ages set forth for Roe's coworkers are derived from a summary report submitted by Target which reflected the employees ages in 2011. The court has subtracted one year from the age on the report to reflect the approximate age (within one year) of the employees at the time Roe's employment was terminated.

discrimination based upon age and disability, stating in his charge with the Commission that Eyer was "responsible for assignments and gives preferential treatment to friends" and reporting to the City/County agency that despite his having suffered a heart attack and Eyer's knowledge of his ongoing heart issues, which cause him to take intermittent FMLA leave, she gave him heavy freight while providing the younger males in their 30s with the easiest work.

- **Jeremy Clark** (37-year-old White, American male) Roe alleges that Clark would not stay busy all the time, would have more downtime, and would receive easier freight. He believes Clark had lower production numbers than him but admits that he never saw Clark's production statistics.  Clark's 2009 review noted that he was at 100% in ART and 108% on Manual Dock; and his 2010 review stated that his ART productivity was at 106.42% and Manual Dock was at 136.2%.  Clark received a rating of "exceeds job requirements" for his overall performance in both years.

- **Lenwood Embry** (67-year-old Black, American male) Though he never saw Embry's production numbers, Roe asserts that Embry had worse production than he did because Embry spent more time talking with others, received easier freight, and "moved slower." Embry received an overall rating of "meets job requirements" in 2009 and 2010.  His 2009 annual review recounted that his ART productivity was 90.08% and Manual Dock was 114.65%, while in 2010 his annual review showed his ART rating at 99.5% and Manual Dock 116%.

- **Michael Ferguson** (39-year-old White, American male) Roe believed his production would have been better than Ferguson's because Ferguson's work habits were inconsistent and he left the work area often.  Ferguson's 2009 annual review revealed that his ART productivity of 85.15% was lower than Roe's and Ferguson had a 111.65% rating on Manual Dock.  In 2010 he was at 92.87% in ART and 105.75% in Manual Dock.  In both his 2009 and 2010 evaluations he was rated as "needs improvement" in "productivity." His overall rating in 2009 was also "needs improvement," but it improved to "meets job expectations" in 2010, despite the criticism of his productivity in ART.

- **Suzi Harris** (47-year-old White, American female, used FMLA) Roe maintains that her production should have been lower than his because she spent a lot of time in the office area and though she was trained to work an area in the office he did not think she was always working when in the office.  Roe also claims Harris talked a lot with others and received easier freight. Harris's 2009 annual review reported her ART productivity at 97.15% and indicated she had an overall CE percentage of 98.26% , which translated to a "needs improvement" rating in "productivity," but an overall rating of "meets job expectations."  Her 2010 annual review showed that she had improved her "productivity" to the point that she had 110.7% score in ART and a 113.4% rating in overall production.  She received an "exceeds job requirements" rating both with respect to her productivity and with regard to her overall performance.

- **William "Duane" Lang** (43-year-old White, male)  Roe claims Lang received easier freight assignments and better treatment from the GLs.  The record does not contain information on Lang's productivity scores, his annual evaluations or any corrective action which he may have been subject to.

- **Julie Mitchell** (43-year-old White, American female, used FMLA) Roe alleges that Mitchell had lower production than he did because she talked and "she just moved much slower." Roe admits that he never saw Mitchell's production statistics while he worked at Target, but asserts that "the girls" received better freight assignments than he did.  Mitchell's 2009 annual review indicated that her ART productivity was 90.34%, and her work in Manual Dock only brought her overall productivity number to 98%.  She was rated as "needs improvement" in both "reliability" and "productivity," which led to an overall rating of "needs improvement" as well. Stephanie Eyer issued Mitchell a written corrective action counseling for unsatisfactory work performance (namely low production) in April 2010 just a week after Roe's termination.  Her annual performance evaluation in September 2010 indicated that Mitchell's CE score was slightly higher than 2009, but she still received a "needs improvement" rating in "productivity" and a similar rating for "teamwork" and "overall performance."  She transferred out of Inbound in January 2011 to another department

- **Ryan Qualls** (35-year-old White, American male, used FMLA) Roe alleges that Qualls received easier freight, had more downtime, did not stay busy, and talked with others when he should have been working.  Roe believes Qualls should have had lower production numbers than him.  In 2009, Qualls' received an "overall performance" rating of "exceeds job expectations" with the same rating given to him in the categories of "teamwork," job knowledge" and "quality."  His productivity in ART was 97.73% with an overall productivity score of 110.4%.  He continued to receive an "overall performance rating of "exceeds job expectations" in 2010, and his review showed he had improved his ART productivity to 113% and that he garnered an "exceeds job requirements" rating in "productivity" as well.

- **Leonard Smith** (49-year-old Black, American male, used FMLA) Roe maintains that Smith should have had lower production than Roe because Smith did not work as hard and "walked around all the time." Smith's 2009 annual review indicates that his ART productivity was at 89.79% and he scored 122.75% in Manual Dock.  His "reliability" rating that year was "needs improvement" and "overall performance" was "meets job expectations."  In 2010 Smith's review revealed that his production in ART was 91.8% and 107.3% on Manual Dock, leading to a rating of "meets expectations" for "productivity."  However his "teamwork" and "reliability" ratings were "needs improvement."

- **Jeremy Spears** (38-year-old White, American male) Roe claims that Spears had more downtime, talked a great deal with others, and received easier freight. Roe

believes his own production must have been better than Spears' production, though he has never seen any of Spears' production numbers.  Spears' 2009 annual review put his ART productivity at 97.63% and Manual Dock at 122.42%, while his 2010 review recounted a rating of "exceeds job requirements" in "productivity" and "teamwork," but "needs improvement" was his rating for reliability.

Roe claims that he and other older white male American born TMs were treated less favorably.  Among those Roe felt were treated poorly and given harder freight to unload were:

- **Ralph Hopkins, Jr.** (50-year-old White, American born male, used FMLA) Hopkins has testified in deposition that he quit Target in June 2010 because his health was suffering as a result of the manner in which he and other older employees were being treated.  Hopkins claims that he and others were made to work at a pace that was not safe.  He claims younger employees were praised for running from spot to spot at the dock, which was not in line with safety protocol.  Eventually he could not take working at Target and took a job for much less pay to avoid further health issues with his digestive tract and his back.

   Hopkins states that he watched the GLs shun Roe for expressing his concerns and also pick on him over the last 6 to 9 months he was there just looking to "find reasons" to say he was not "Target material."  While Hopkins thought there may have been some race or gender favoritism also shown by the GLs, he was certain that younger TMs received more favorable treatment, including easier loads to work, better specialty function assignments and more praise from the GLs.  He indicates that when he and another TM, Sam Knotts, brought their concerns of favoritism to the attention of a GL, they were loudly rebuffed by the supervisor.

- **Greg Kinder** (53-year-old White, American born male, used FMLA) Kinder was terminated by Stephanie Eyer in April 2011 for poor performance.  No records regarding his productivity scores or evaluations are in the record.

- **Samuel Knotts** (47-year-old White, American born male, used FMLA) Knotts was terminated by Stephanie Eyer for poor work performance in February 2011.  He claims that there was a group of younger TMs, which he referred to as "the A-team," who received the best freight to unload and the best specialty function assignments.  According to Knotts the A-team included Jeremy Clark, Jason Beck, Jeremy Spears, Duane Lang, Ryan Qualls and Suzi Harris (all of whom, with the exception of Harris, were in their 30s), and they were allowed to stand around and talk, walk away from the line or not work for 15 minutes while older employees would be chastised immediately for any such indiscretion.  Knotts also believes that females and non-whites were treated much better than older white

males, because they were held to a lower standard and were allowed to work the type of freight that would "up" their production numbers.

Knotts states that he watched Roe face discrimination because of his age and also because Roe had complained about the favorable treatment of others. Knotts also complained to the GLs, the SGL and the GM regarding favoritism in the assignment of freight and work areas.   He also spoke to people at the Indianapolis Human Resources department and placed an anonymous call to a Target hotline at the home office to complain of favoritism.   As a result he believes he was targeted for dismissal.   He states that Stephanie Eyer was the meanest supervisor he ever had and that while she talked down to older employees, she treated younger TMs better because they were closer to her age and she interacted with them both at and away from work.   Knotts also feels that he was treated much differently (poorer treatment such as heavier workloads) after he came back from taking FMLA leave.

## II.      Method of Proof

A plaintiff suing because he believes he was discharged or disciplined as a result of unlawful discrimination, whether he alleges discrimination based on age, race, gender or national origin, may prove his case either directly or indirectly.   *Coleman v. Donahoe,* 667 F.3d 835, 845 (7th Cir. 2012);*Martino v. MCI Communications Services, Inc.,* 574 F.3d 447, 452 (7th Cir. 2009).   Because circumstantial evidence may be used under either of these approaches, the distinction between the two is often tough to discern.   *Martino,* 574 F.3d at 452.   However, until the muddy water of evidentiary proof in discrimination cases is cleared by a complete abandonment of two separate "proof" methodologies, such as proposed by Judge Wood in her concurrence in *Coleman,* the trial courts must soldier on, wading through the swampy areas of overlap in both evidence and legal theory.

To avoid summary judgment under the direct method of proof, a plaintiff must either adduce direct evidence of discrimination or circumstantial evidence sufficient to create a "convincing mosaic of discrimination" based upon a protected factor such as race, gender, national origin, age or the plaintiff's participation in a protected activity.   *Good v.*

*University of Chicago Medical Center,* 673 F.3d 670, 674 (7th Cir. 2012).  Most often,

such a "mosaic" will be pieced together with circumstantial evidence that falls into one of

three categories:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or
> comments directed at other employees in the protected group;
> (2) evidence, whether or not rigorously statistical, that similarly situated
> employees who do not share the protected characteristic receive systematically
> better treatment; or
> (3) evidence that the employee was qualified for the job in question but was
> passed over in favor of, or replaced by, a person outside the protected class and
> the employer's explanation for the same is unworthy of belief.

*Darchak v. City of Chicago Board of Educ.*, 580 F.3d 622, 631 (7th Cir.2009); *Troupe v.*

*May Dept. Stores Co.* 20 F.3d 734, 736 (7th Cir. 1994).  In any case where a plaintiff is

relying solely on circumstantial evidence to prove discrimination using the direct method,

that circumstantial evidence may not be teamed with conjecture or presumption to make

the case; rather, the evidence must point directly to a discriminatory reason for the

defendant's action.  *Good,* 673 F.2d at 675; *Lim v. Trustees of Indiana University,* 297

F.3d 575,580 (7th Cir. 2002).  This threshold is very high, particularly in certain

circumstances, such as appear in the case at bar, where reverse discrimination is claimed

with respect to race, national origin or sex.  *Good,* 673 F.3d at 676-77.

Plaintiff may also seek to avoid summary judgment utilizing the indirect method

of proof, which invokes the burden-shifting analysis described by the Supreme Court in

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).   Under the burden-shifting

analysis, a plaintiff must first establish a prima facie case of discrimination by

demonstrating that (1) he is a member of a protected class; (2) he met his employer's

legitimate job expectations; (3) he suffered an adverse employment action; and (4)

similarly situated employees outside of the protected class received more favorable

treatment.[3]   *Keeton v. Morningstar, Inc.,* 667 F.3d 877, 884 (7th Cir. 2012)(citing

*Everroad v. Scott Truck Systems, Inc*., 604 F.3d 471, 477 (7th Cir.2010)).  If the plaintiff

establishes a prima facie case of discrimination, the burden then shifts to the employer to

offer a non-discriminatory reason for the adverse employment action.  *Id.*  If the

employer articulates a nondiscriminatory reason for its action, the burden shifts back to

the plaintiff to submit evidence demonstrating that the employer's explanation is a lie or

pretext for discrimination.  *Id.*

Although the question of pretext normally arises only after a prima facie case of

discrimination has been put forth and the employer has countered with a legitimate non-

discriminatory reason for the adverse action, particular factual circumstances may cause

the court to skip over the initial burden-shifting of the indirect method and focus directly

on the question of pretext.  *Bodenstab v. County of Cook,*569 F.3d 651, 657 (7th Cir.

2009).  For example, where a plaintiff produces evidence that the employer has applied

its job performance expectations in a disparate manner, "the second and fourth prongs of

*McDonnell Douglas* merge allowing the plaintiff to establish a *prima facie* case, stave off

summary judgment for the time being, and proceed to the pretext inquiry."  *Peele v.*

*Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002).

Finally, where, like Roe here, a plaintiff is attempting to prove reverse

discrimination with regard to race, national origin or gender, the first prong of the

*McDonnell Douglas* template is altered and requires that the plaintiff show either that the

---

[3] With respect to a claim of age discrimination under the ADEA, which prohibits discrimination
against those over the age of 40, a similarly situated employee receiving more favorable
treatment need not be under 40 years of age, so long as there is a significant difference between
that person's age and the age of the person asserting the ADEA claim.  *O'Conner v.*
*Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996).

facts at hand seem particularly dubious or that there is something in the background of the employer that would demonstrate a reason or inclination to discriminate against whites, males or those who are American born.  *See Good,* 673 F.3d at 678; *Ballance v. City of Springfield*, 424 F.3d 614, 617-18 (7th Cir. 2005).

### III.    Standard of Review

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor.  *See* Fed. R. Civ. Pro. 56.  To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial.  Fed. R. Civ. Pro. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. Pro. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. Pro. 56(c) (1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. Pro. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment. Fed. R. Civ. Pro. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. Pro. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson v. Cambridge Indus.,* 325 F.3d 892, 898 (7th Cir.2003). Furthermore, reliance on the pleadings or conclusory statements backed by inadmissible evidence is insufficient to create an issue of material fact on summary judgment. *Id*. at 901.

The key inquiry, then, is whether admissible evidence exists to support a plaintiff's claims or a defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir.1999). And when evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial ... against the moving party." *Celotex,* 477 U.S. at 330.

## IV.    Discussion

### *Reverse Discrimination*

In *Mills v. Health Care Service Corp.*, 171 F.3d 450 (7th Cir. 1999) the Seventh Circuit recognized that "it is an unusual employer that discriminates against majority employees." *Id.* at 456-57. Accordingly, the court found that there is a heightened examination of circumstances warranted when a member of the majority claims discrimination. *Id.* at 457. While such scrutiny in no way precludes a plaintiff with direct evidence of discrimination against the majority from bringing the claim, without an announced predisposition to favor a so-called protected class, the plaintiff must be able to

adduce facts that would support such an inclination. *Id.* In *Mills* the plaintiff met that burden by showing that, over a seven-year span at the defendant's office there was a disproportionate hiring pattern favoring females, women garnered almost all the promotions and, women came to dominate the supervisory positions at the office. *Id.* at 457-58. In another decision, the Seventh Circuit found the factual circumstances of a case "fishy" enough to support a reverse discrimination claim where the record included a city commissioned report, which revealed that the police chief took into consideration minority race and female gender when hiring, assigning, promoting and disciplining officers. *Ballance,* 424 F.3d at 617-18.

Target argues that there is no evidence in the record in this case of any history or circumstance that could cause a fact-finder to believe that Target, or Roe's GLs more particularly, would tend to discriminate against American born Caucasians such as Roe. Citing the Supreme Court decision in *Ricci v. DeStefano*, 557 U.S. 557, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009), Roe argues first that he is not required to meet any higher burden than a minority plaintiff seeking to demonstrate discriminatory conduct.

In *Ricci,* the Supreme Court allowed a disparate treatment claim brought by white (and one Hispanic) firefighters, whose scores on promotional tests were not certified because of potential disparate impact on minority firefighters, to survive summary judgment. *Id.* However, in *Ricci* the city's entire defense was premised on its need to comply with Title VII's prohibition against disparate impact and protect itself against a disparate impact case brought by minorities, who it believed would be adversely impacted if it certified all of the test scores. *Id,.* 557 U.S. at 579-581. The Supreme

Court recognized that it was dealing with a case where there was direct evidence of discriminatory intent, stating:

> Our analysis begins with this premise: The City's actions would violate the disparate-treatment prohibition of Title VII absent some valid defense.  All the evidence demonstrates that the City chose not to certify the examination results because of the statistical disparity based on race— i.e., how minority candidates had performed when compared to white candidates.  As the District Court put it, the City rejected the test results because "too many whites and not enough minorities would be promoted were the lists to be certified."

*Id.,* 557 U.S. at 579 (quoting *Ricci v. DeStefano,* 554 F.Supp2d 142, 152 (D.Conn. 2006).

The Supreme Court did not determine, as Roe suggests, that there is no difference in the way the record should be examined when a member of the majority seeks to prove reverse discrimination.  This Court does not stand alone in its analysis of the *Ricci* decision.   Subsequent to the Supreme Court's *Ricci* opinion, the Seventh Circuit reaffirmed the altered first prong of the *McDonnell Douglas* template where a majority member is claiming discrimination in its decision in *Good v. University of Chicago Medical Center,* 673 F.3d 670, 679 (7th Cir. 2012).

Plaintiff also argues that the record does show a set of circumstances which supports an inclination on the part of Target to discriminate against white American born males.  In 2008 Target had a "Dream in Color" campaign where cultural celebrations were held throughout the year and a poem by Dr. Maya Angelou, was added to the company's diversity policy, which poem celebrated the progress of those who had been discriminated against in the past and reaffirmed a commitment to equality and dignity of all peoples.  Roe contends that such celebratory programs might be appropriate "if they also recognize that employers must treat whites equally" and then subjectively opines that this was not the case with Target.  Roe cites too little else in the record to support his

argument of race based discrimination and fails to cite evidence in support of his claim of reverse sex and national origin discrimination as well.[4]   Roe offers no response to Target's citation to case law affirming the proposition that the existence and aspirational purpose of an employer's diversity policy is not sufficient to show that that employer has or will base an adverse employment action on such a policy.  *See Bissett v. Beau Rivage Resorts, Inc.,* 442 Fed.Appx 148, 153 (5th Cir. 2011); *Jones v. Bernanke*, 493 F.Supp.2d 18, 29 (D.D.C. 2007); *Reed v. Agilent Technologies, Inc.*, 174 F.Supp.2d 176, 185-86 (D.Del. 2001).

At the time of his termination, all but one of the 43 TMs he had worked with while being supervised by either Lopez or Eyer were, like Roe, American born.  Of those 43, 36 were white and 37 were men.  The individual who replaced Roe was a white American born male.  Nothing in the racial, gender or national origin make-up of the employees at the Target Indianapolis warehouse would support the idea that the company was inclined to discriminate against a white American born male.  Roe's mention that the record reflects Eyer's firing of four white employees is unremarkable in light of the fact that 84% of the workforce she supervised was white and she is white as well.  When it comes to his allegations of reverse discrimination, Roe has no support in the record which would cause a fact-finder to reasonably find the circumstances at Target so extraordinary that the company would be suspect for discriminating against American born white males.

---

[4] In a Surreply, Plaintiff does cite to some hearsay testimony he offered during his deposition to support his claim of national origin discrimination, but even if such testimony were not hearsay, a Surreply is no place to bring forth evidence to contradict arguments  which were made in the defendant's initial brief.

Furthermore, even if he had no obligation to pique the Court's attention with regard to unusual circumstances, Roe has failed to show that any female, non-white or non-American TM with a similar performance record or similar history of below average evaluations was treated any better than he. Roe points to the fact that both a female and Hispanic co-worker received multiple written counselings from GLs but were never fired; however, Roe fails to develop a record that comes anywhere close to showing that these individuals had the history of poor evaluations and counseling that he had. Finally, reading Roe's deposition and reviewing the history of his complaints and his discontent at Target, it is abundantly clear that it has nearly always been the age of those TMs he believes were better treated which he sees as being the distinguishing factor. The race, gender and national origin allegations appear to be almost an afterthought, not only with Roe, but with those witnesses deposed whose testimony was offered in support of his claims.[5] At bottom his claims of reverse discrimination based upon race, sex and national origin are not supported by the evidence and must be dismissed.

*FMLA Retaliation*

Target also asserts that Roe has no evidence to support his claim of FMLA retatiliation. Roe contends that if not directly discriminatory, his termination may have been in retaliation for his having used FMLA leave. To support this assertion he points to the fact that he was fired only 30 days after returning from FMLA leave. However, the

---

[5] For example, in his deposition, co-worker Samuel Knotts testified that a group of TMs he referred to as the "A-Team" would always get better freight than he, Roe and a couple of other TMs. The distinguishing factor Knotts used in describing who made up the "A-Team" was age, the younger TMs. Another co-worker , Ralph Hopkins, Jr., was asked in his deposition why he believed Roe was discriminated against, and his answer was that Roe, like Hopkins himself, was given harder freight than the younger TMs and passed over for certain positions in favor of younger, less senior TMs.

Seventh Circuit has often stated that suspicious timing alone is rarely enough to establish a genuine issue of material fact.  *E g., Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009).

To supplement the evidence of the timing of his termination, Roe only offers the fact that his GLs had been critical of his attendance record.  However, a supervisor's criticism of an employee's poor attendance record is entirely different from criticism or retribution for use of FMLA leave.  As reflected in Target's PCD reports, at the Indianapolis warehouse, an employee's attendance record is analyzed and scored on the basis of their "accountable" time out of the distribution center, and FMLA leave is not accountable time.  Thus a GL's discussions with Roe regarding his attendance marks has nothing to do with his use of FMLA leave.  Furthermore, Roe makes no effort to offer a comparable individual who had not utilized FMLA leave and was treated more favorably than he.  In the end, Roe has not proffered a convincing mosaic of circumstantial evidence nor established a prima facie case under the indirect method of proof and, therefore, his FMLA retaliation claim cannot survive summary judgment.

*Age Discrimination*

Target points out in its opening brief that 35 of the 43 TMs who worked with Roe under the same GLs who recommended his termination were over 40.  It argues that Roe has no direct evidence of discrimination so he must proceed under the *McDonnell Douglas* burden shifting paradigm.  In his response brief, Roe never really attempts to differentiate his proof methodology.  Though he does discuss some evidence in the context of certain steps of the *McDonnell Douglas* template, his argument is more broadly based and he points to a myriad of factual circumstances which he believes paints a picture of ongoing age discrimination against Roe and others from 2004 forward.  In its

reply brief, Target argues that Roe's failure to advocate in favor of the "mosaic" approach to the direct proof methodology leaves him to rely only upon the indirect method of proof. In a surreply, Roe contends that his case, like most discrimination cases, is built upon circumstantial evidence and need not be mechanically categorized as one that is "direct" or "indirect" in methodology.[6] He maintains that regardless of any categorization of the Plaintiff's method of proof, the Court must take into account the entire record of circumstantial and direct evidence to make a determination whether there is a material question of fact which should allow the case to move forward.

The Seventh Circuit has not completely discarded the analysis of discrimination claims under either the "direct or indirect" methodologies. Nevertheless, it has increasingly referred to the overlap between the two methods and described their distinctions as particularly vague or confusing when the plaintiff is offering circumstantial evidence regarding the treatment of other employees as evidence of pretext or discriminatory intent. *See Coleman*, 667 F.3d at 860 (and concurring opinion at 863). Accordingly, the Court will not be quick to read into a plaintiff's brief an abandonment of either method of proof, so long as the argument being made is that the overall factual circumstances show a genuine issue as to whether discrimination permeated an employer's decision making process.

The real question here is what evidence is Roe advancing to create a question of fact as to the discriminatory intent of Target. The answer is that Roe's focus is clearly on his contention that younger workers in Inbound were treated better and, in particular, were given easier work assignments that allowed them to obtain higher productivity

---

[6] Target has moved to strike the Surreply of Roe, which motion the court denies in part and grants in part as discussed later in this entry.

grades.  The evidence of record to support that contention is:  (1) Roe's own subjective testimony;  (2) similar subjective and anecdotal testimony of deposed witnesses Samuel Knotts and Ralph Hopkins, Jr.; (3) allegations of age discrimination contained in the discrimination charge filed by employee Juan Cisnero; (4) remarks in a company investigative document attributed to Eyer (acknowledging that "cherry-picking" by GLs had been an issue in the past, in particular with the GL who preceded her, and that she rewards some TMs with specialty functions duty) (5) the fact that despite rotation schedules or protocols for placing employees in particular work areas and for trailer scheduling, GLs still maintained discretion in work and trailer assignments; (6) the timing of Roe's poor performance reviews beginning at the point that he turned 40 years old; and (7) several older employees working under Stephanie Eyer were fired for reasons similar to those used to support Roe's termination.

Target accurately points to Roe's performance as having been evaluated as subpar for over a year prior to his termination and also notes the increasing number of critical entries in his PCD over the course of that time period, including numerous entries even after he had been made subject to a final warning regarding subpar performance.  It maintains that Roe simply cannot show that he was meeting Target's legitimate job expectations.  However, Target is ignoring the fact that Roe has, in essence, challenged the legitimacy or reasonableness of its job expectations by offering his testimony and the testimony of Knotts and Hopkins who all relate that those expectations were applied unevenly.  If it were only Roe who offered such an opinion, it might be easily chalked up to his own self-serving hypothesis, but in addition to the testimony of Knotts and Hopkins, there is also the fact that notes from Target's own in-house investigation of an

anonymous employee complaint, acknowledge a GL's admission that "cherry-picking" had been an issue in the past and that some TMs were receiving specialty function assignments as a reward.

There is some additional evidence that a fact-finder may see as evidence of inconsistency in Target's expressed reason for firing Roe.  Though Target insists that Roe was terminated because he had demonstrated a history of poor quality, reliability, teamwork and productivity, Lopez's own notes of his conversation with Roe when terminating him, state that he told Roe only that he was being terminated because he had not demonstrated an improvement in his poor productivity.

Examining the aforementioned three categories of circumstantial evidence which are recognized in employment discrimination cases as bearing on an employer's intent, *see Troupe,* 20 F.3d at 736*,* the Court finds that Roe has offered two of the three types. First, he has shown suspicious timing with regard to his poor performance reviews beginning when he turned age 40, and he has offered testimony of several witnesses regarding the behaviors exhibited by GLs toward older employees.   Roe has also proffered evidence that falls in the second category, insofar as he has elicited witness testimony that younger employees were given better freight, better work location assignments, and allowed to get away with more "non-work" activities while on the job. Upon Roe's firing, he was replaced by an individual three years his junior, which the Court does not find to be a significant enough difference to amount to circumstantial evidence which would fall into the third category.   Nevertheless, Roe need not offer all three types of circumstantial evidence; he need only produce sufficient evidence to allow

a rational trier of fact to believe that his age played a role in the decision to terminate his employment.

In deciding whether summary judgment should be granted or whether the evidence is sufficient for an inference of age discrimination to be drawn, the Court may not make judgments on the credibility of witnesses or choose among multiple inferences that might be drawn from the evidence. *Paz v. Wauconda Helathcare and Rehabilitation Centre, LLC,* 464 F.3d 659, 664-65 (7th Cir. 2006). It is for that reason, this Court must decline Target's request for summary judgment. It appears that Roe's ADEA claim will turn on whether the fact-finder believes that the work in Target's regional distribution center's Inbound department was distributed relatively evenly between the TMs through the legitimate use of the trailer slotting tool and employee rotation schedules , or whether older employees, who may have been viewed as less productive, were purposely given tougher work assignments in order to assure that the otherwise facially objective productivity measurements would reflect poorly on them or create enough performance pressure on them to cause them to resign. That type of determination will necessarily be based on the believability of Knotts, Hopkins and Roe versus the Target GLs (and perhaps others at trial). While some of those witnesses may have more self-interest and motivation to stretch the truth than others, that credibility assessment as well must be for a jury.

*Retaliation*

To make it past the summary judgment stage with his retaliation claim via the direct method of proof, Roe must show that: (1) he engaged in protected activity; (2) he was subsequently subject to an adverse employment action; and (3) there was a causal

connection between the two. *Coleman,* 667 F.3d at 859. He may also indirectly establish his case, first by demonstrating that: (1) he engaged in a statutorily protected activity (that the decision-makers knew about); (2) he performed his job according to Target's legitimate expectations; (3) despite his satisfactory job performance he suffered an adverse action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 668-69 (7th Cir. 2006).

Roe has testified that he complained to the GLs, TL, GM and Human Resources personnel of discrimination based on age, and that he added race and gender as well to his complaints of favoritism when he went to Human Resources. His testimony is sufficient to establish a question of fact on the issue of whether he engaged in protected activity. While Jessica Ryan claims that Roe used the term discrimination broadly and in a manner which caused her to believe that he simply meant that the GLs had some favorites and he was not among them, she admits that he did use the terms discrimination and harassment, which should at a minimum arouse the interest of any corporate human resources representative. Furthermore, Roe's GLs knew that he was complaining of favoritism as can be shown with a review of their comments in his evaluations and in his PCD.

In addition to the evidence discussed in the section above with regard to the age discrimination claim, both Roe and Knotts also claim that they specifically mentioned age when challenging the GLs directly for their favoritism. Furthermore Ryan participated in drafting Roe's corrective actions, which followed relatively closely after he went to complain to her. Finally, there is no question that the number of comments on

Roe's PCD multiplied greatly after he visited Ryan and that they were almost unanimously negative in nature, which could at a minimum support an inference of increased scrutiny.

Whether you collapse the 2nd and 4th elements of the indirect method and move to the issue of pretext, or simply assess whether the circumstantial evidence proffered by Roe points to a discriminatory motive, the result is the same. Credibility and choice of circumstantial inference will again rule the day. Did Roe or Knotts really mention age or any other protected characteristic in their complaints to supervisors and human resources personnel, or were they simply complaining generically that the GLs were being tougher on them and played favorites when distributing work assignments? Is Ryan's claim that no protected characteristics were ever mentioned by Roe believable? A jury, not the Court, must answer these questions.

*Motion to Strike Surreply*

Target seeks to strike the surreply brief submitted by Plaintiff as violating the limitations that Local Rule 56-1(d) puts on such filings. According to Target, there was no new evidence proffered with its Reply and it did not object to evidence proffered with Roe's response brief within its Reply. It claims that Plaintiff's Surreply is merely a rehash of arguments previously waived or made. Roe argues that the Surreply is justified by the new arguments raised by Target in its Reply, specifically that he had waived any claim based upon sex and national origin or any claim that he had sufficient circumstantial evidence to avoid summary judgment under the direct method of proof.

The Court always tries to allow litigants a full and fair opportunity to respond to arguments made by their adversary, including allowing surreplies, *see e.g., Pike v.*

*Caldera,* 188 F.R.D. 519, 535-36 (S.D. Ind. 1999), and Target's waiver argument was, technically, new to its reply.  However, the Court agrees with Target, that beyond arguing that he had not waived his ability to resist summary judgment through the direct method nor given up on his claims of gender or national origin based discrimination, the Surreply is either a rehash of previously made arguments or an attempt to point out supporting facts for the claims he contends he did not waive, which is an effort that properly belonged in his response brief.

Accordingly, other than that portion of the Surreply which specifically takes issue with Target's contention that he waived his claims or a particular method of proving claims, Roe's Surreply is stricken.

### V.      Conclusion

For the reasons explicated in this entry, the Court grants in part and denies in part Defendant's Motion to Strike Plaintiff's Surreply (Dkt. #54) and grants in part and denies in part Defendant's Motion for Summary Judgment (Dkt. #33).

Plaintiff may proceed to trial with his claim that he was fired because of age discrimination and his claim that his termination was in retaliation for his having engaged in the protected activity of complaining of Defendant's illegal discrimination.  Defendant is entitled to summary judgment on all other claims raised in Plaintiff's Complaint.

IT IS SO ORDERED.

08/08/2012

_Jane Magnus-Stinson_
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Richard L. Darst**
**COHEN GARELICK & GLAZIER**
**rdarst@cgglawfirm.com**

**David S. Wagner**
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART**
**david.wagner@ogletreedeakins.com**

**Kristin B. Keltner**
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART**
**kristin.keltner@odnss.com**